UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                       :
PNC BANK, NATIONAL ASS'N, *successor by merger to* :
NATIONAL CITY BANK,                              :
                                        :
                       Plaintiff,           :        12 Civ. 8570 (PAE)
                                        :
                   -v-                :        OPINION & ORDER
                                        :
WOLTERS KLUWER FINANCIAL SERVICES, INC.,       :
et al.,                                        :
                                        :
                       Defendants.          :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/15/14

PAUL A. ENGELMAYER, District Judge:

     In this diversity action, PNC Bank, National Association ("PNC") sues Wolters Kluwer

Financial Services, Inc. ("WKFS") for, *inter alia*, breach of contract, based on the claim that

PNC was harmed by the "misperformance" of a Secure Document Exchange ("SDX") system

that PNC had licensed from WKFS. PNC alleges that in December 2010, it learned that SDX

had failed to timely transmit copies of consumer loan disclosures that PNC was legally mandated

to deliver to customers, that WKFS was responsible for this malfunction, which persisted until

February 2011, and that, as a result, PNC's mortgage-related disclosures to more than 2,000 PNC

customers were delayed.

     Before the Court now are the parties' cross-motions for summary judgment. For the

reasons that follow, the Court (1) denies PNC's motion for summary judgment on its breach of

contract and breach of warranty claims, (2) grants WKFS's motion for summary judgment on all

of PNC's other claims, *i.e.*, its quasi-contract and non-contract claims, and (3) grants WKFS's

motion for summary judgment as to the damages sought by PNC, on the grounds that the

damages PNC has pursued to date are all consequential damages barred under the parties'

agreements.  The Court, however, grants PNC's motion to amend its Complaint to add a claim

for general damages, seeking recoupment of the money that PNC paid WKFS under the parties'

agreements, while granting WKFS's motion to re-open discovery to enable it to probe PNC's

newly-added theory of such damages.  In light of PNC's failure to seek such damages until after

the close of the original discovery period, the Court further orders that WKFS's costs in pursuing

this new avenue of discovery be shifted, in part, to PNC, on the terms specified herein.

I.     **Background**[1]

    A.     **The Parties**

        PNC is a federally chartered national banking association with its principal place of

business in Pittsburgh, Pennsylvania.  Joint 56.1 ¶ 1.  In January 2010, PNC acquired National

---

[1] The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the instant motions, including the parties' Joint Rule 56.1 Statement of Undisputed Facts (Dkt. 79) ("Joint 56.1"), and the exhibits attached thereto, including the Master License and Services Agreement (Ex. 1) ("MLSA") and the Secure Document Exchange With Paper Fulfillment Schedule (Ex. 2) ("SDX Schedule"); PNC's Rule 56.1 Statement (Dkt. 81) ("Pl. 56.1"); the Declaration of Peri A. Berger in Support of PNC's Motion for Partial Summary Judgment (Dkt. 82) ("Berger Decl."), and the exhibits attached thereto; WKFS's Rule 56.1 Statement (Dkt. 86) ("Def. 56.1"); the Declaration of Matt D. Basil in Support of WKFS's Motion for Summary Judgment (Dkt. 87) ("Basil Decl."), and the exhibits attached thereto; WKFS's Response to PNC's Rule 56.1 Statement (Dkt. 89) ("Def. 56.1 Response"); Declaration of Matt D. Basil in Support of WKFS's Response in Opposition to PNC's Motion for Partial Summary Judgment (Dkt. 91) ("Basil Response Decl."), and the exhibits attached thereto; PNC's Response to WKFS's Rule 56.1 Statement (Dkt. 94) ("Pl. 56.1 Response"); the Declaration of Peri A. Berger in Support of PNC's Opposition to WKFS's Motion for Summary Judgment (Dkt. 97) ("Berger Response Decl."), and the exhibits attached thereto; and other documents as cited.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the

City Bank ("NCB"), a federally chartered national banking association with its principal place of business in Cleveland, Ohio. *Id.* ¶¶ 2, 6. WKFS is a Delaware corporation, engaged in the business of providing information products and services, with its principal place of business in Minneapolis, Minnesota. *Id.* ¶ 3.

> **B.    The MLSA and the SDX Schedule**

This case involves a pair of agreements under which WKFS licensed a computer system to NCB (later PNC) to manage the bank's dissemination of legally required disclosures to persons who had applied for mortgages with the bank.

First, on September 25, 2009, WKFS and NCB entered into the Master License and Services Agreement ("MLSA"), which contains the "sole and exclusive terms and conditions that . . . govern the rights, responsibilities, and obligations" of WKFS and NCB regarding the licensing of WKFS's services. *Id.* ¶ 4; MLSA 1, 5. Second, on December 29, 2009, WKFS and NCB entered into a related agreement, the "Secure Document Exchange with Paper Fulfillment Schedule" ("SDX Schedule"), under which WKFS agreed to furnish NCB with "Secure Document Exchange (SDX) with Paper Fulfillment," a computer system that WKFS produces and licenses and which NCB would use to securely deliver loan documents to mortgage applicants. Joint 56.1 ¶¶ 5, 7, 44; SDX Schedule 1. On February 22, 2010, after PNC had acquired NCB, NCB assigned its interests in the two agreements to PNC. Joint 56.1 ¶¶ 4, 5. Because PNC succeeded to NCB's rights and obligations under the agreements, in describing their terms and operation, the Court henceforth refers to PNC where the agreements refer to NCB.

---

statement required to be served by the opposing party."); *id*. at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

PNC and WKFS agree that the MLSA and SDX Schedule are valid and enforceable.

*Id.* ¶ 32.  Under the agreements, the parties defined SDX as "an outsourced electronic delivery system for initial disclosures and closing loan packages that will assist [PNC] in complying with federal and state laws and regulations concerning such electronic delivery of compliance documents."  SDX Schedule 1.  WKFS warranted that the SDX system would be "Operative at all times" while the agreements were in place, MLSA 19, with "Operative" defined to mean that the SDX system, in PNC's reasonable judgment, would perform in accordance with the specifications set out in the agreements and their attachments.  *Id.* at 3.  WKFS also warranted that the SDX system would meet or exceed "the performance levels and technical specifications" set out in the attached schedules.  *Id.* at 7.  Further, WKFS agreed to implement updates to SDX "as they [became] commercially available."  SDX Schedule 10.

PNC, for its part, was to compensate WKFS for licensing SDX with Paper Fulfillment. Specifically, PNC was to pay for this service on a per-package basis.  The cost of each electronic package that PNC uploaded to SDX for transmittal to a mortgage applicant would range from $0.04 to $4.50, depending on the package's size; the cost of each package that was to be transmitted in printed (hard-copy) form was to range from $0.89 to $4.55, depending on the number of pages.  *Id.* at 3–4.  WKFS was to invoice PNC at least monthly, and to set out the "[u]nit cost per item . . . for [SDX]."  MLSA 14.

As to indemnification, the MLSA provided that:

> WKFS will defend, indemnify, and hold harmless [PNC] . . . against all costs and expenses . . . arising from or in connection with a claim, suit, action, proceeding, or demand . . . brought against [PNC] by a third party . . . for . . . gross negligence or willful misconduct by WKFS or WKFS Personnel.  [PNC] shall provide WKFS: (a) reasonably prompt written notice of the existence of such Claim or Expenses; [and] (b) control over the defense or settlement of any such Claim.

*Id.* at 22.  But, the MLSA provided, in terms highly relevant here, that neither party would be liable for consequential damages:

> **NEITHER PARTY WILL BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING BUT NOT LIMITED TO, LOST PROFITS ARISING OUT OF OR RELATED TO THIS AGREEMENT AND THE SERVICES AND/OR PRODUCTS SUPPLIED HEREUNDER, EVEN IF THE PARTIES HAVE KNOWLEDGE OF THE POSSIBILITY OF SUCH DAMAGES AND WHETHER OR NOT SUCH DAMAGES ARE FOR[E]SEEABLE.**

*Id.* at 23 (capitalization and boldface in original).

## C.    Mechanics of SDX's Operation

SDX allowed WKFS's customers, such as PNC, to upload documents or "packages" to SDX electronically; these documents were encrypted, held on a secure server, and made available for online retrieval by third parties designated by WKFS's customer.  Joint 56.1 ¶ 8.  Here, the third parties were PNC's mortgage applicants.  Through SDX with Paper Fulfillment, PNC transmitted various types of mortgage documents to applicants.  *Id* ¶¶ 41, 42, 43; *see also* SDX Schedule 1 (agreeing to provide SDX for delivery of "initial disclosures and closing loan packages that will assist [PNC] in complying with federal and state laws and regulations concerning such electronic delivery of compliance documents").  For each package, PNC sent metadata to SDX containing document-specific delivery instructions, including, critically, how many days a package would be available electronically before being printed and mailed (the "day count" or "paper count").  Joint 56.1 ¶ 21.  PNC delivered this metadata to SDX through an IBM loan origination system that it licensed and used, known as "imPACT."  *Id.* ¶ 26.  imPACT, which maintained data related to mortgage applications and loans, generated and communicated to SDX the day count for each of PNC's timed packages.  *Id.* ¶¶ 20, 21, 26, 27.

Mortgage applicant customers were able to retrieve packages online.  However, such "[t]imed packages" or "eDisclosures" were retrievable online by customers for only a defined period of time; if they were not electronically retrieved by the end of that period, the package would "expire," or cease to be available electronically.  *Id.* ¶¶ 10, 11.  At that point, the document was "papered out," meaning that it was "forwarded to [WKFS]'s paper fulfillment center for printing and mailing."  *Id.* ¶ 11; *see also* SDX Schedule 1 ("[I]f a borrower fail[ed] to open an eDisclosure delivered via SDX within the required timeframes, SDX [would] recall such eDisclosures at a selected daily cut-off time for SDX Paper Fulfillment processing.").

When a timed package became available electronically, SDX sent an email to the intended recipient notifying him or her that the documents were available, with instructions on how to access them.  Joint 56.1 ¶ 17.  SDX also sent the recipient a series of reminder emails if he or she had failed to retrieve the documents; these were sent 24, 48, and/or 56 hours after the documents became available.  *Id.* ¶ 18.  SDX sent a final notification email to the recipient when a package had expired and was no longer available electronically.  *Id.* ¶ 19.  At this point, the package was forwarded to WKFS's fulfillment center for paper printing and mailing.  *Id.* ¶ 11.

### D.    The Updates in 2010 to imPACT and SDX

On the night of October 17, 2010, IBM applied an update to imPACT entitled R14 ("R14 Update").  *Id.* ¶ 31.  This update did not affect how imPACT had previously calculated day counts; imPACT retained its prior methodology of calculating how many days a package would be electronically available prior to being papered out.  Berger Decl., Ex. O, at 2; *id.*, Ex. P, at 3.

WKFS, for its part, provided several updates to SDX, including one on July 26, 2010 ("Q2 Update").  *Id.*, Ex. U, at 4.  After the release of the Q2 Update, SDX experienced "inconsistent performance," *id.* at 3, as it did not properly calculate holidays and weekends in its

day count for package expiration.  Basil Decl., Ex. 23, at 2.  On October 18, 2010, WKFS, to address this situation, implemented the October 18, 2010 update ("Q3 Update"), which excluded weekends and holidays in SDX's day count.  *Id.*

### E.   Discovery of a Disclosure Delivery Defect

On December 23, 2010, PNC received a complaint from a borrower indicating that the borrower had received an expiration notification for a SDX package after the borrower's loan had already closed.  Joint 56.1 ¶ 54.  PNC had been required to provide that package of documents to the borrower before the loan had closed.  *Id.*  On February 23, 2011, PNC received a second, similar customer complaint, this time indicating that a disclosure package had been delivered later than required by federal and state laws and regulations.  *Id.*  ¶ 59.

PNC ultimately determined that more than 10,000 loans had been similarly affected. Berger Decl., Ex. Z, at 3.  It ultimately issued refunds of residential mortgage settlement costs to 2,038 customers, including waivers of fees made at the time of closing.  Joint 56.1 ¶ 64; Pl. 56.1 Response ¶ 81; Basil Decl., Ex. 10, at 5; Berger Decl., Ex. Z, at 3.

After receiving the December 23, 2010 complaint, PNC asked IBM to research why the documents had not been timely delivered (the "disclosure delivery defect") and thereafter to fix the problem.  Joint 56.1 ¶¶ 55, 56.  On January 7, 2011, IBM made a first attempt to implement a software patch to fix the defect.  Basil Decl., Ex. 18, at 8.  On February 15, 2011, after four prior failed attempts, IBM successfully implemented a fix to the defect.  *Id.* at 3–4, 8.  This patch changed the way that imPACT calculated day counts.  *Id.* at 4; Pl. 56.1 Response ¶ 52.  WKFS was not involved in implementing the patch.  Basil Decl., Ex. 41, at 3.  WKFS, however, was aware of the existence of a problem with respect to calculating day counts, Pl. 56.1 ¶¶ 20, 21, 22;

Berger Decl., Ex. K, at 11–12, and on February 25, 2011, IBM informed WKFS that it had fixed the issue.  Basil Decl., Ex. 20, at 1.

      PNC, following investigation into the disclosure delivery defect, ultimately concluded that the coinciding software updates by IBM and WKFS on October 18, 2010 had together resulted in incompatible calculations of holidays and weekends for day counts.  IBM's imPACT system included weekends and holidays in the day-count metadata, and then provided that day count to SDX, the WKFS product.  Def. 56.1 ¶ 47; Berger Decl., Ex. P, at 3 ("IBM was including weekends and holidays in the days out calculation.").  But SDX's Q3 Update excluded weekends and holidays in its day-count calculation.  *Id.*  ("WKFS was not" including weekends and holidays in the day count.).  This incongruity as to the calculation of day counts[2] meant that although PNC's documents were being uploaded to SDX, they were not expiring to be printed and mailed to PNC's customers in time to comply with PNC's regulatory requirements.  Basil Decl., Ex. 16, at 3.

      On March 10, 2011, PNC reported by email to IBM and WKFS its conclusion that the disclosure delivery defect had begun on October 18, 2010, that the problem resulted from a "mismatch" between IBM's and WKFS's day-count calculations, and that it did not result from IBM's R14 Update to imPACT, as PNC had previously believed.  Berger Decl., Ex. P, at 3. PNC disputed that IBM's October 18, 2010 R14 Update alone "could have caused this issue." *Id.*

---

[2] For example, if PNC uploaded a package on November 23, 2014 that needed to expire and then be printed and delivered by SDX on May 22, 2015, imPACT would calculate the time period as 180 days, while SDX would calculate it as 124 days, because SDX excluded holidays and weekends from its calculation.  *See* Berger Decl., Ex. P, at 3; Basil Decl., Ex. 23, at 2.

WKFS also analyzed the cause of the disclosure delivery defect.  Its investigation was conducted without WKFS's having had access to the imPACT system.  Joint 56.1 ¶ 28.  On March 14, 2011, WKFS shared with PNC and IBM the results of its investigation.  Basil Decl., Ex. 23.  It, too, found that the coinciding updates by IBM and WKFS on October 18, 2010 had interfered with each other and thereby with the day-count calculations.  *Id.* at 2.

### F.   Procedural History

On November 26, 2012, PNC filed this action for breach of contract, breach of the implied covenant of good faith and fair dealing, gross negligence, unjust enrichment, breach of express warranties, and indemnity.  Dkt. 1 ("Compl.").  Its Complaint alleges, *inter alia*, that WKFS breached the MLSA and SDX Schedule, and breached the express warranties contained in those agreements, by failing to ensure the proper functioning of SDX.  *Id.* ¶ 1.  The Complaint seeks damages for the "substantial monetary losses" PNC suffered as a result, "including its out-of-pocket cost to commission and obtain the KPMG audit" and "expos[ure] to liability in an amount not less than $4,996,282.00."  *Id.* ¶ 33.  As more fully discussed below, in its ensuing interrogatories to PNC, WKFS inquired into the specific categories of damages that PNC was pursuing, and PNC's responses clarified that subject.

On July 8, 2014, the parties filed cross-motions for summary judgment, Dkt. 80, 84, and supporting memoranda of law, Dkt. 83 ("PNC Br."), 85 ("WKFS Br.").  PNC seeks summary judgment on liability for its breach of contract and breach of warranty claims.  WKFS, for its part, seeks summary judgment on PNC's quasi-contract and non-contract claims, on the grounds that the parties' dispute is governed by contract.  WKFS also seeks summary judgment on all claims on the ground that, as PNC's disclosures and responses to interrogatories clarify, all

damages sought by PNC constitute consequential damages, which the MLSA precludes PNC from seeking.

On July 22, 2014, the parties filed memoranda in opposition; PNC also cross-moved to amend its complaint to add a claim for damages that it contended was not barred by the MLSA.  Dkt. 90 ("WKFS Opp. Br."), 93 ("PNC Opp. Br.").  On August 5, 2014, the parties filed reply memoranda.  Dkt. 99 ("PNC Rep. Br."), 103 ("WKFS Rep. Br.").  WKFS opposed PNC's cross-motion to amend, Dkt. 102 ("WKFS Amend Opp. Br."), and PNC filed a reply on that motion.  Dkt. 105 ("PNC Amend Rep. Br.").

On October 27, 2014, the Court directed PNC to file a proposed Amended Complaint to facilitate discussion at oral argument—scheduled for October 31, 2014—of PNC's motion to amend.  Dkt. 111.  On October 29, 2014, PNC did so.  Dkt. 112 ("Proposed Am. Compl.").  On October 30, 2014, the Court directed WKFS to be prepared at argument to specify all areas of new discovery WKFS would pursue if PNC's proposed Amended Complaint were permitted.  Dkt. 114.  On October 31, 2014, WKFS filed a motion in response to that order, listing the categories of discovery.  Dkt. 115.  The same day, the Court heard argument.  Dkt. 116 ("Tr.").

## II.    Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d

Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes

over "facts that might affect the outcome of the suit under the governing law" will preclude a

grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In

determining whether there are genuine issues of material fact, the Court is "required to resolve

all ambiguities and draw all permissible factual inferences in favor of the party against whom

summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing

*Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Discussion

By way of overview, PNC moves for partial summary judgment on two counts: breach of

contract (Count I) and breach of express warranty (Count V).  PNC argues that the evidence

unambiguously shows that WKFS breached its contract and its express warranties and that

WKFS's breaches were the sole, or at least principal, cause of PNC's damages.

WKFS moves for summary judgment on two grounds.  First, it moves against PNC's

implied covenant (Count II), gross negligence (Count III), unjust enrichment (Count IV), and

indemnification (Count VI) claims, on the ground that the parties' relationship is governed by the

MLSA and SDX Schedule.  Second, WKFS moves against all of PNC's claims, on the ground

that the damages PNC seeks all relate to its losses from issuing refunds and from the cost of its

audit into the disclosure delivery defect, and thus are barred by the MLSA's waiver of consequential damages. WKFS argues that PNC is not seeking reimbursement for the money it paid WKFS under the contract, which WKFS concedes would constitute general damages and would not be precluded by the MLSA.

### A.    Breach of Contract

Under New York law, "to state a claim of breach of contract, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citations omitted). Here, the parties agree that the MLSA and SDX Schedule were binding contracts. Joint 56.1 ¶¶ 4, 5, 32. Their dispute turns instead on whether WKFS failed to perform under them. PNC argues that WKFS's Q3 Update was the sole or principal cause of the disclosure delivery failures; this premise is the basis of its summary judgment motion. PNC Br. 9. PNC claims that, as a result, it paid WKFS for a product that was unusable, incurred audit expenses to determine the scope of its regulatory violations, and made refunds to affected customers. *Id.* at 5. WKFS counters that, at a minimum, there were other material causes for the disclosure delivery defect, including IBM's R14 Update to imPACT; that IBM's R14 Update principally caused the delivery problems; and that in any event, WKFS's Q3 Update cannot be found, on summary judgment, to be the sole or main cause of the disclosure delivery defect.

There is evidence on which a finder of fact could support both parties' characterizations of the facts. The parties' dispute on summary judgment boils down to whether WKFS's Q3 Update principally caused the disclosure delivery defect, or whether IBM's R14 Update, or some other factor, including the interplay between the updates, was the cause. Favoring PNC, there is

evidence that IBM's R14 Update did not change imPACT's code for calculating when a package should expire and thus be printed and delivered to a customer. Pl. 56.1 ¶ 40; Berger Decl., Ex. O, at 2–3. And a WKFS "root cause" analysis report states that WKFS's Q3 Update involved a software code change to how day counts were calculated; the updated SDX code excluded weekends and holidays in its calculations of when a package should be delivered. *Id.*, Ex. V, at 2. Crediting this evidence, a finder of fact could conclude that it was WKFS's Q3 Update that changed SDX's day-count calculations, whereas IBM's imPACT, post the R14 Update, continued to calculate and thus communicate to SDX day counts in the same fashion as it had before the Q3 Update.

On the other hand, favoring WKFS, there are documents PNC produced and testimony from PNC employees that attribute the document delivery issues to the IBM R14 Update. Def. 56.1 Response ¶¶ 40, 41, 42, 124; Basil Response Decl., Ex. 50, at 13–14; *id.*, Ex. 53, at 4 ("It was determined that the issue was created with R14 and has been occurring since 10-18 but the imPACT team was not aware until 12/23 that there may be a potential issue."); *id.*, Ex. 54, at 3 ("What changed with R14 that could have caused this issue?"); *id.*, Ex. 67, at 7–10 ("[T]he delayed disclosures between October 18 and February 15 were caused by the implementation of R14? [Objection omitted] That is my understanding.").

Further, there is a substantial basis in evidence on which a finder of fact could conclude that there was shared responsibility for the problem among IBM, WKFS, and PNC, or that the problem arose from the synergistic interaction of updates by IBM and WKFS. Revealingly, IBM, WKFS, and PNC, in their separate investigations into the document delivery defect, each arrived at a more nuanced conclusion as to causation of the delivery problem than alleged by

PNC, and *none* identified WKFS's Q3 Update as the sole and/or main cause of the disclosure delivery defect.

Thus, IBM, in its preliminary investigation, acknowledged that imPACT, following IBM's R14 Update, may have miscalculated the day counts in the metadata sent to SDX.  Def. 56.1 Response ¶ 116; Basil Decl., Ex. 16, at 2.  And WKFS's March 14, 2011 investigation report concluded that the separate updates by IBM and WKFS had canceled out each other's changes regarding the day-count calculations—concluding, in effect, that the problem resulted from the interaction of the two changes.  *Id.*, Ex. 23, at 2.  Finally, PNC likewise found that a "mismatch" between IBM and WKFS's day-count calculations had caused the late deliveries. Berger Decl., Ex. P, at 3.  PNC's report further noted that imPACT had been excluding weekends and holidays for eight months, but then "something broke from 10/18/10 through 2/14/11" that led imPACT to start including weekends and holidays.  *Id.*

This assembled evidence prevents the Court from granting PNC's motion for summary judgment, because that motion is premised on the claim that, factually, WKFS's Q3 Update was solely or principally to blame for the disclosure deficiencies that arose.[3]  And other record evidence places weight on factors exogenous to WKFS.  A WKFS employee, for example, blamed the large day counts that imPACT was submitting to SDX for causing the disclosure delivery defect.  *Id.*, Ex. E, at 22.  Although WKFS had asked imPACT to provide those large day counts, *see id.*, Ex. R, at 3; *id.*, Ex. T., at 2, IBM had declined WKFS's proposal to develop a solution that did not require the large paper counts.  Basil Response Decl., Ex. 55, at 3.   On the

---

[3] The parties have not briefed whether (and if so, under what circumstances) WKFS could be in breach, in the event that the finder of fact were to conclude that the combination of the two updates—WKFS's and IBM's—acted synergistically to cause the problem.  Should the case proceed to trial, the Court would expect briefing on that point.

summary judgment record, it is unclear whether imPACT's submission of large paper counts was a significant cause of the disclosure delivery defect.  *See id.*, Ex. 23, at 2.  Finally undermining PNC's claim that WKFS was solely responsible for the disclosure delivery issues is that PNC was the only WKFS customer who licensed SDX and experienced a disclosure delivery defect after receiving WKFS's Q3 Update.  Def. 56.1 Response ¶ 114; Basil Response Decl., Ex. 46, at 15–16.

Because there is evidence in the summary judgment record that favors each side on the issue of whether WKFS was solely or principally responsible for the disclosure delivery defect, the trier of fact could find for PNC or WKFS as to whether WKFS was in breach.  The Court, therefore, denies PNC's motion for summary judgment on its breach of contract claim.

### B.      Breach of Express Warranty

To prevail on a breach of express warranty claim under New York law, a plaintiff must establish that: "(1) plaintiff and defendant entered into a contract; (2) containing an express warranty by the defendant with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by defendant."  *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999).  Here, there is no dispute that the parties entered into two contracts—the MLSA and the SDX Schedule—and that the contracts contained certain express warranties.  The parties instead dispute whether there are genuine issues of material fact regarding whether WKFS's SDX product met these representations and warranties.

The factual issues underlying this claim substantially overlap with those underlying the breach of contract claim.  PNC alleges that WKFS breached three warranties:

- "WKFS further warrants that [SDX] shall conform to or exceed in all material respects the performance levels and technical specifications described in the [SDX Schedule]."  MLSA 7.

- "WKFS represents and warrants to [PNC] that [SDX] will be Operative at all times during the term of [the SDX Schedule]."  *Id.* at 19.

- "'Operative' will mean, in [PNC]'s reasonable judgment, [SDX] will perform in accordance with the terms of [the MLSA], and the Documentation, and the product description attached to the [SDX Schedule]."  *Id.* at 3.

PNC, reprising the allegations underlying its breach of contract claim, argues that SDX could not have "conform[ed] to or exceed[ed] in all material respects the performance levels and technical specifications described in the [SDX] Schedule," if, as it alleges, it was WKFS that caused SDX not to function.  PNC Br. 18–19.  But, as noted, there is another view of the evidence, in which the disclosure delivery defect was due largely, if not wholly, to factors outside of WKFS's control.  Because a trier of fact could reasonably find for either party on this claim, PNC's motion for summary judgment on the breach of warranty claim must also be denied.

### C.      Quasi-Contract and Non-Contract Claims

WKFS moves for summary judgment on PNC's four quasi-contract and non-contract claims: breach of implied covenant of good faith and fair dealing (Count II), gross negligence (Count III), unjust enrichment (Count IV), and indemnification (Count VI).   The parties have stipulated that the MLSA and SDX Schedule are valid, enforceable contracts, governing their agreement as to WKFS's provision of SDX to PNC.  Joint 56.1 ¶ 32.   And PNC concedes that if this Court finds the MLSA and SDX Schedule to be valid, enforceable contracts that control the nature, extent, and scope of the parties' relationship relating this dispute, it cannot pursue those claims.  PNC Opp. Br. 17; Tr. 2–3.

PNC is right to so concede.  Under New York law, where there is a breach of contract claim and a valid, enforceable contract is found, a court will not recognize separate causes of

action for breach of the implied covenant of good faith and fair dealing, common law indemnity, gross negligence, and unjust enrichment.  *See Mid-Hudson Catskill Rural Migrant Ministry*, *Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (unjust enrichment); *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) (breach of the implied covenant of good faith and fair dealing); *In re Chateaugay Corp.*, 10 F.3d 944, 958 (2d Cir. 1993) (gross negligence); *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 7908 (PAE), 2013 WL 2631043, at *5 (S.D.N.Y. June 11, 2013) (gross negligence); *CSC Scientific Co. v. Manorcare Health Servs., Inc.*, 867 F. Supp. 2d 368, 377–78 (S.D.N.Y. 2011) (common law indemnity).  In essence, on these claims, PNC is seeking recoveries that are duplicative of its breach-of-contract claim. These claims thus must be dismissed.

As for PNC's contractual indemnification claim, the MLSA's indemnification clause reads in pertinent part as follows:

> WKFS will defend, indemnify, and hold harmless [PNC] . . . against all costs and expenses . . . arising from or in connection with *a claim, suit, action, proceeding, or demand . . . brought against [PNC] by a third party . . . for . . . gross negligence or willful misconduct by WKFS or WKFS Personnel.* [PNC] shall provide WKFS: (a) reasonably prompt written notice of the existence of such Claim or Expenses; [and] (b) control over the defense or settlement of any such Claim.

MLSA 22 (emphasis added).  The clause, however, is not triggered here, because there is no record evidence that any "claim, suit, action, proceeding, or demand" was ever brought against PNC by a third party.  Nor is there evidence that PNC gave WKFS written notice of any such claim, or that it permitted WKFS to take control over resolution of the claim.  *See* Def. 56.1 ¶ 80; Pl. 56.1 Response ¶ 80.  Indeed, although PNC's Complaint alleges that "[t]he failure of [WKFS] under the [MLSA] . . . exposed PNC to the *risk* of multiple civil lawsuits and regulatory enforcement action," Compl. ¶ 23 (emphasis added), it nowhere alleges that any such lawsuit or

enforcement action materialized.  Accordingly, PNC is not entitled to contractual indemnity under the MLSA.

The Court therefore grants WKFS's motion for summary judgment on PNC's quasi-contract and non-contract claims.

### D.        General and Consequential Damages

Under New York law, two types of damages may be pled in contract cases: (1) general damages and (2) consequential damages.  "A plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised.'"  *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000) (quoting 3 Dan B. Dobbs, *Dobbs Law of Remedies* § 12.2(3) (1993)).  Consequential damages "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach."  *Id.* at 175 (citation omitted).

To obtain consequential damages, "a plaintiff must demonstrate that the parties contemplated those special damages as the probable result of the breach at the time of or prior to contracting."  *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 618 F. Supp. 2d. 280, 292 (S.D.N.Y. 2009) (citing *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319 (N.Y. 1989).  "The Court looks to 'the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.'"  *Id.* at 302–03 (citing *Kenford*, 73 N.Y.2d at 319).

In this case, PNC, in the MLSA, explicitly waived consequential damages.  The issue, then, is whether the type of damages that it seeks constitutes direct or consequential damages.

To address this question, the Court first reviews PNC's pleadings in this case with respect to damages.  These show that PNC has *not* sought to recover the money it paid to WKFS under the MLSA and the SDX Schedule, a damage claim that undisputedly would have constituted general damages.  Instead, PNC has sought to recover damages totaling $4,996,282, representing money it expended on the following four items: (1) refund payments to clients ($3,740,143); (2) legal and audit fees ($1,083,525); (3) materials costs ($322); and (4) allocated internal resources ($172,292).  The Court then considers whether each of these represents general or consequential damages.

### 1.   PNC's Pleadings with Respect to Damages

PNC's Complaint alleged that it had "suffered substantial monetary losses, including its out-of-pocket cost to commission and obtain the KPMG audit, . . . expos[ing] [PNC] to liability in an amount not less than $4,996,282.00," the total amount enumerated above.  Compl. ¶ 33.  In its ensuing Rule 26(a) disclosures and interrogatory responses, PNC clarified that it sought only the four categories of damages recited above.  Specifically, in each response to such a discovery demand by WKFS, PNC attached a December 9, 2011 letter from Saiyid Naqvi, chief executive officer of PNC Mortgage, to Jason Marx of WKFS (the "December 9, 2011 Letter"), which recited only these four categories of asserted damages.  Each time, PNC stated that these totaled "$4,996,282 in direct remedial payments and costs associated with PNC's investigation and audits."  Basil Decl., Ex. 32, at 9; *id.*, Ex. 42, at 18; *see id.*, Ex. 43, at 7.   Thus:

- On April 8, 2013, PNC filed its Rule 26 initial disclosures.  *Id.*, Ex. 32.  To identify the categories of damages it sought, PNC attached the December 9, 2011 Letter.  *Id.* at 10.

- On October 4, 2013, PNC filed its initial responses to WKFS's first set of interrogatories. *Id.*, Ex. 42. To identify the "damages incurred by PNC as a result of the facts alleged in the Complaint," PNC again attached the December 9, 2011 Letter. *Id.* at 8, 19.

- On December 23, 2013, PNC filed its supplemental Rule 26 initial disclosures, *Id.*, Ex. 43. To outline the "categories of PNC's damages in this matter, and the amount associated with each respective category," PNC again attached the December 9, 2011 Letter. *Id.* at 7.

Notably, in none of these submissions did PNC state or imply that it sought to recover any of the money it paid to WKFS.

It was not until June 10, 2014, more than two weeks after the close of discovery, that PNC changed course on this point. It did so at a court conference convened to discuss the parties' anticipated summary judgment motions, including the motion WKFS had stated it would make to preclude all of PNC's damage claims on the grounds that they sought consequential, not direct, damages. *See* Dkt. 77, at 32 (The Court: "[A]re you seeking in effect recoupment from Wolters Kluwer of the money you paid to them for their services?" Mr. Molnar: "We would seek it. That was not pled with specificity."). PNC conceded, however, in argument that it had sought those damages only in connection with a *non*-contract claim: its claim for unjust enrichment, a cause of action that presupposed the invalidity of the contract. *Id.* at 34; Compl. ¶ 49 (WKFS "has not offered, nor made any attempt to offer, the reimbursement of fees and charges paid to it by PNC despite . . . the fact that PNC has incurred substantial monetary losses as the direct and proximate result of [WKFS]'s actions."). PNC's bid to add a claim for such contract damages at this late date was untimely. *See Design Strategy, Inc. v. Davis*, 469 F.3d

20

284 (2d Cir. 2006) (affirming decision to exclude evidence of lost profits that was first pursued post-discovery); *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 490 (S.D.N.Y. 2009) (declining to permit the addition of damages claims after the close of fact and expert discovery and at the summary judgment motion stage); *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, No. 09 Civ. 8578 (JPO) (HBP), 2013 WL 1608489, at *4 (S.D.N.Y. Apr. 15, 2013) (precluding newly asserted damages claims brought after the close of discovery).

### 2.    Analysis of PNC's Claims for Damages

As to the four categories of damages that it has timely sought, PNC opposes, for two reasons, WKFS's motion for summary judgment on the ground that these damages were general, not consequential.  Focusing on two categories—the refunds PNC paid to its mortgage-applicant clients ($3,740,143) and the legal and audit fees ($1,083,525) it incurred[4]—PNC argues, first, that how such damages are properly classified is a question of fact that may not be resolved until trial.  Second, it argues, on the merits, that these damages are general damages, which the MLSA permits it to pursue.  The Court addresses each argument in turn.

To the extent PNC argues that the characterization of its damages request is a question of fact that may not be resolved on summary judgment, *see* PNC Opp. Br. 3, it is wrong.  Courts in this District have often determined, at the summary judgment stage, whether damages claims are general or consequential.  *See, e.g.*, *Phoenix Warehouse of Calif., LLC v. Townley, Inc.*, No. 08 Civ. 2856 (NRB), 2011 WL 1345134 (S.D.N.Y. Mar. 29, 2011); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314 (S.D.N.Y. 2009); *E. Brass & Copper Co.*

---

[4] PNC, in its brief, does not specifically address the classification of its material costs and allocated internal resources.  Because PNC incurred those two categories of damages in relation to the audit that PNC commissioned from KPMG, the Court treats these categories as subject to the same analysis governing the legal and audit fees category of damages.

*v. Gen. Elec. Supply Corp.*, 101 F. Supp. 410 (S.D.N.Y. 1951).  In arguing to the contrary, PNC

relies on *American Electric Power Co. v. Westinghouse Electric Corp.*, which noted that "[i]n

general, the precise demarcation between direct and consequential damages is a question of

fact."  418 F. Supp. 435, 459 (S.D.N.Y. 1976).  But that abstract proposition does not carry the

day here.  Not all claimed damages require factual discovery to determine whether they are direct

or consequential.  And there has been ample discovery in this case to allow the Court to classify

the categories of damages at issue.

 As to the merits of WKFS's motion, the relevant facts are briefly stated.  With respect to

audit and investigative fees, in June 2011, PNC retained the firm KPMG to perform an audit to

determine the number of late disclosures and to calculate a proposed amount of customer refunds

PNC might choose to pay as a result of the disclosures.  Joint 56.1 ¶¶ 62, 63; Basil Decl., Ex. 10,

at 16–18; *id.*, Ex. 8, at 10–12.  PNC represents that this work cost the bank $1,083,525.  PNC's

material costs ($322) and allocated internal resources ($172,292) were incurred in relation to the

KPMG investigation.  Pl. 56.1 Response ¶ 88.

 With respect to the refunds, following the discovery of the disclosure delivery defect,

PNC notified the Office of the Comptroller of the Currency ("OCC"), which regulates national

banks, of the defect.  Basil Decl., Ex. 8, at 8.  The OCC never required nor directed PNC to

provide customer refunds.  *Id.* at 9.  Of its own accord, PNC provided 2,038 affected customers

with refunds of residential mortgage closing costs, including waivers of fees made at the time of

closing.  *Id.* at 9–10, 14–15; *id.*, Ex. 10, at 5.  The refunds, calculated during the KPMG audit, in

total cost PNC $3,740,143.  At the time, PNC was unaware of any other lenders having provided

refunds to customers as a result of similar disclosure delivery defects.  *Id.*, Ex. 8, at 14–15.  Nor

was PNC aware of any instances in which the OCC had penalized a bank for untimely

disclosures.  *Id.*, Ex. 9, at 15.  WKFS did not participate in PNC's decision to refund money to customers.  Joint 56.1 ¶ 65.

In arguing that the audit/investigative and refund expenses it incurred are direct damages, PNC argues that these damages were a "natural and probable consequence" of WKFS's breach and thus are recoverable as general damages.  PNC Opp. Br. 7.  PNC relies on the decision in *Biotronik A.G. v. Conor Medsystems Ireland, Ltd. et al.*, 22 N.Y. 3d 799 (2014).  There, the New York Court of Appeals held that because a plaintiff had paid the defendant for a product at a price calculated as a percentage of plaintiff's net sales of the product, the plaintiff's lost profits resulting from the breach were general damages.  *Id.* at 808–10.  Thus, the Court held, lost profits were "clearly contemplated" under the parties' contract.  *Id.* at 808.

The payment relationship between PNC and WKFS, as contemplated under the MLSA, does not, however, resemble that in *Biotronik*.  Instead, the parties' contract is more closely akin to what the Court of Appeals called "a simple resale contract, where one party buys a product at a set price to sell at whatever the market may bear."  *Id.* at 803.  PNC licensed SDX from WKFS to deliver documents to its customers.  PNC, on its own and without WKFS's input, charged its customers for the services it rendered them, which included delivery of the packages.  And, when a possible breach arose, PNC chose to refund customers certain fees.

The refunds PNC paid its mortgage-applicant customers cannot fairly be termed general damages, reflecting "the value of the very performance promised."  *Schonfeld*, 218 F.3d at 175 (citation omitted).  It is undisputed that PNC elected to make these payments on its own.  No provision of its contract with WKFS obliged it to do so; WKFS played no part in PNC's decision to do so.  Joint 56.1 ¶ 65.  The refunds were for residential mortgage settlement costs, including waivers of fees made at the time of closing, Basil Decl., Ex. 10 at 5; at the time the 2,038 refunds

were made, PNC was not aware of any other lender who had issued comparable refunds because

of untimely disclosures, *id.*, Ex. 8, at 14–15, and no regulatory agency directed it to make such

refunds.  *Id.*, Ex. 9, at 16.  Under these circumstances, the payment of the refunds was not a

"natural and probable consequence" of a breach of contract by WKFS, *Biotronik*, 22 N.Y. 3d at

808, but instead a form of consequential damages, because it was "one step removed from the

naked performance promised by the defendant," *Schonfeld*, 218 F.3d at 177; *see also Nat'l*

*Investor Servs. Corp. v. Integrated Fund Servs., Inc.*, 85 F. App'x 779, 781 (2d Cir. 2004) (fee

waivers paid to customers after a breach of contract were "not the natural result of the breach");

*Phoenix Warehouse*, 2011 WL 1345134, at *5 ("The key consideration is . . . whether [the

breaching party] contemplated at the time of the contract's execution that it assumed legal

responsibility for these damages upon a breach of the contract.") (citation omitted); *cf.*

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 449 (S.D.N.Y. 2003)

(lost profits from continued performance of collateral business contracts with customers after

breach were consequential damages).

   The same conclusion applies to the investigative audit and legal fees that PNC incurred in

determining how to respond to the disclosure deficiencies.  As with the decision to make refunds,

PNC acted alone, without consulting WKFS, in retaining KPMG to conduct an audit.  On the

record before the Court, no regulator or law compelled PNC to conduct an audit, let alone to

deploy an outside auditor.[5]  *See A.I. Trade Finance, Inc. v. Centro Internationale Handelsbank*

---

[5] To be sure, a PNC witness testified that there was "interagency guidance related to compliance issues similar to this [that] lays out the expectation that [an audit] will be conducted and that either applicants or borrowers, whichever is applicable, will be made whole in such circumstances, including appropriate interest on whatever funds they are deemed to have paid erroneously."  Basil Decl, Ex. 8, at 9–10.  However, that witness also noted that PNC was "not specifically directed by the OCC to take that step."  *Id.* at 10.  Although pursuing the audit and paying the customer refunds may have been enlightened from the perspective of corporate

*AG*, 926 F. Supp. 378, 385–86 (S.D.N.Y. 1996) (classifying investigation and litigation expenses after breach of contract as consequential and incidental damages); *Hallinan v. Republic Bank & Trust Co.*, 519 F. Supp. 2d 340, 354–55 (S.D.N.Y. 2007) (classifying consequential damages to include "legal fees and costs in litigation"; such fees are recoverable only if the damages were foreseeable and within the parties' contemplation at the time the contract was made).

PNC, finally, argues that these expenses were foreseeable, in that a person imagining a breach that caused a bank not to deliver required notices to customers could reasonably expect that the bank would incur legal and audit costs investigating the cause of the non-delivery, and might also expect the bank, in the interest of customer relations, to refund money to affected customers. But the distinction between direct and consequential damages does not turn on the foreseeability of downstream damages. *See, e.g.*, *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007); *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44 (1989). Rather, the concept of foreseeability is relevant where consequential damages are authorized because foreseeability serves as a limit on the extent to which consequential damages, when available, may be awarded. *See, e.g.*, *Kenford*, 67 N.Y.2d at 261; *Biotronik*, 22 N.Y.3d at 806. And here, the MLSA explicitly excluded "indirect" and "consequential" damages,

> **EVEN IF THE PARTIES HAVE KNOWLEDGE OF THE POSSIBILITY OF SUCH DAMAGES AND WHETHER OR NOT SUCH DAMAGES ARE FOR[E]SEEABLE.**

MLSA 23 (capitalization and boldface in original).

---

governance and preserving PNC's reputation with customers, they were ultimately elective decisions by the bank.

The Court, accordingly, holds that the four categories of damages timely sought by PNC are consequential damages expressly barred by the MLSA's damages waiver. The Court, therefore, grants WKFS's motion for summary judgment as to such damages.

### E.      Leave to Amend Complaint and Additional Discovery

Aware of the high prospect that all four categories of damages that it had pursued would be held non-cognizable, PNC moved during summary judgment briefing for leave to amend its Complaint to add a claim for general damages, specifically, for recoupment of the money it paid WKFS under the MLSA. WKFS objects to this motion. It notes that the case management plan and scheduling order, proposed by counsel and issued on March 6, 2013, stated that "[a]mended pleadings may not be filed and additional parties may not be joined except with leave of the Court. Any motion to amend or to join additional parties shall be filed within 30 days from the date of this Order." Dkt. 11. WKFS further notes that PNC had repeated opportunities during discovery to pursue such general damages, but instead persistently identified only consequential damages. WKFS Amend Opp. Br. 3. In the alternative, WKFS asks that, in the event that the Court permits PNC to amend its Complaint to seek such damages, that WKFS be allowed to take discovery to permit it to probe issues presented by the new claim for general damages. The Court addresses the motions below.

### 1.      Leave to Amend Complaint

Under Federal Rule of Civil Procedure 15(a)(2), "[a] court should freely give leave [to amend] when justice so requires." However, "[w]here, as here, a scheduling order governs amendments to the complaint . . . the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir.

2009) (citation omitted).  Rule 16(b) "provides the district courts discretion to ensure that limits on time to amend pleadings do not result in prejudice or hardship to either side."  *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 243–44 (2d Cir. 2007).  The Second Circuit instructs that, in determining good cause, a district court's "primary consideration is whether the moving party can demonstrate diligence.  It is not, however, the only consideration.  The district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants."  *Id.* at 244.  A district court's decision to grant or deny leave to amend is "an exercise of its broad discretion concerning the pleadings."  *Id.* at 245.

Although the question is a close one, the Court finds that good cause exists for permitting PNC to amend the Complaint to pursue recoupment of the money it paid WKFS.  Although PNC did not pursue such damages in connection with its breach of contract and breach of warranty claims, it did pursue such damages in its now-dismissed unjust enrichment cause of action, in which it sought claims for fees paid to WKFS during the period SDX malfunctioned.  Compl. ¶ 49.  PNC ought also to have included a claim for such damages in its claims sounding in contract, but its failure to seek such damages in such claims along with its quasi-contract claims appears not to have been a strategic decision so much as an odd and misguided lapse by its (contrite) outside counsel.  And WKFS cannot claim genuine surprise.  It was altogether unsurprising that PNC would eventually alert to its technical lapse and pursue this obvious category of contract damages, as PNC announced it would seek to do once notified of the nature of WKFS's summary judgment motion.  *See* Dkt. 77, at 32.  WKFS even tabulated, in that motion, its calculation of what such general damages would be.  WKFS Br. 15.

Further, WKFS has failed to show genuine prejudice from the timing of PNC's proposed amendment. At argument, WKFS pressed hard against permitting the amendment, making the broad claim that adding this general damages claim would prejudice it. But, when questioned about concretely what prejudice it would suffer, WKFS came up short. The Court was left to conclude that the "prejudice" WKFS would experience would primarily be denial of a windfall: a complete pretrial victory due not to vindication on the merits, but due to its adversary's pleading lapse.

Beyond that, there is little, if any, true prejudice to PNC. The areas of discovery legitimately opened up by allowing PNC to seek to recoup the fees it paid to WKFS are extremely modest, as the Court's colloquy with counsel at argument revealed. *See* Tr. 36–43; *see also* p. 30–31, *infra*. And, as explained below, the Court will partially shift the costs incurred by WKFS in pursuing this limited discovery to PNC, so as to assure that WKFS does not suffer from the inefficiencies of reopened discovery. Otherwise, the witnesses relevant to the issue remain available, *see* Tr. 58. And although WKFS has claimed other acts of spoliation involving certain KPMG documents, there is no claim that documents relating to the simple theory of direct damages that PNC proposes to add have been destroyed or allowed to disappear between the filing of the original Complaint and today. *Id.* at 23; *cf.* Dkt. 75 (WKFS's spoliation motion).

Having found good cause for permitting the proposed amendment, the Court next must address the factors set forth in Rule 15(a). *See Estate of Ratcliffe v. Pradera Realty Co.*, No. 05 Civ. 10272 (JFK), 2007 WL 3084977, at *4 (S.D.N.Y. Oct. 19, 2007). "A Court should deny a motion to amend only for good reasons, such as 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of

amendment.'" *Estate of Ratcliffe*, 2007 WL 3084977, at *4 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  The Court, however, does not find any bad faith or a dilatory motive on PNC's part.  And although PNC repeatedly recited only the four species of consequential damages in its successive responses to WKFS's discovery demands, once notified of WKFS's intended motion, it promptly notified the Court of its intention to seek to add a claim to recover the money it had paid WKFS.

WKFS, finally, argues that PNC's amendment is futile.  WKFS Amend Opp. Br. 11. That is wrong.  WKFS's own submissions are sufficient to persuade the Court that, assuming a breach of contract by WKFS were to be found, the theory of direct damages that PNC will now pursue would afford it meaningful monetary relief—relief PNC cannot at present receive, given the consequential nature of the four damages theories it has pled.  *See, e.g.*, *Matheson v. Kitchen*, 515 F. App'x 21, 23 (2d Cir. 2013) (listing, in factors relevant to futility, "the importance of the testimony" at issue, and "the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony") (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

In the interest of justice, the Court therefore grants PNC leave to file the proposed Amended Complaint, and specifically to add a claim for general damages comprised of the fees it paid WKFS under the MLSA and SDX Schedule.  Dkt. 112.[6]

---

[6] The Court has no occasion to consider here whether, assuming WKFS is found in breach, all or only a subset of the money it was paid by PNC for SDX would be recoverable.  However, at argument, PNC committed that, to the extent that its theory of damages may be keyed to monies received by WKFS for providing disclosures to the particular customers affected by the malfunction, PNC agreed that it would not claim that more than the 2,038 customers who received refunds were affected.  Tr. 50.

### 2.      Additional Discovery

As noted, WKFS asks that if PNC's motion to amend the Complaint were granted, WKFS be permitted to reopen discovery.  At argument and in its motion for leave to take such discovery, WKFS stated that it would engage a damages expert; depose a PNC corporate-designee witness pursuant to Fed. R. Civ. P. 30(b)(6); and seek documents from PNC, KPMG, and IBM.  Tr. 36, 38; Dkt. 115.  WKFS estimated that its incremental discovery would cost "six figures" and that the final cost would turn largely on the amount of expertise (if any) required.  Tr. 42.

Although the Court is skeptical that there are capacious areas of discovery truly opened up by PNC's belated bid to recoup the fees it paid WKFS, the Court will permit WKFS to pursue additional discovery on these points.  And, to assure that the inefficiency of reopened discovery (*e.g.*, a second deposition of a witness who need only have been deposed just once had PNC pled its new damages claim at the outset) does not prejudice WKFS, the Court will shift some of WKFS's new discovery fees and costs onto PNC.  Specifically, of the first $200,000 of the fees and costs that WKFS incurs in additional discovery, 50% of these (*i.e.*, up to $100,000) are to be reimbursed by PNC.  WKFS is to pay the other 50% of these fees and costs, however, both in recognition that it proposes to explore new topics in discovery and to assure that it has a financial incentive to engage only in productive discovery.  Any fees or expenses incurred by WKFS beyond the first $200,000 are to be borne by WKFS alone.

The Court's authority to shift costs of discovery in this fashion "stems from its broad discretion under Rule 15(a), which empowers a court to impose conditions when granting leave to amend."  *Xpressions Footwear Corp. v. Peters*, No. 94 Civ. 6136 (JGK), 1995 WL 758761, at *6 (S.D.N.Y. Dec. 22, 1995) (citing 6 Charles A. Wright & Arthur R. Miller, *Federal Practice*

*and Procedure* § 1486 (1990)).  "The most common condition imposed on an amending party is

costs."  *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 939 (S.D.N.Y. 1989) (citing

Wright & Miller, *supra*); *see also Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 599 (5th Cir.

1981) ("[T]rial court can avoid any prejudice from [additional discovery], for it has discretion to

tax the costs of the repeated discovery proceeding against [the amending party].") (citing *Bamm,

Inc. v. GAF Corp.*, 651 F.2d 389, 392 n.5 (5th Cir. 1981)); *Estes v. Ky. Utilities Co.*, 636 F.2d

1131, 1134 (6th Cir. 1980) ("[C]osts of preparing for litigation could be imposed on the party

who asserts a valid, but untimely, . . . affirmative defense.").

## CONCLUSION

For the reasons set out above, the Court dismisses PNC's claims for breach of the implied

covenant of good faith and fair dealing, gross negligence, unjust enrichment, and indemnity, and

dismisses all damages claims in the present Complaint on the grounds that they are consequential

damages, unavailable under the MLSA and SDX Schedule.  The Court, however, grants PNC's

motion to amend its Complaint, so as to add a claim for general damages, to wit, the money it

paid WKFS under the MLSA and SDX Schedule.  Any such amended complaint is to be filed by

Friday, December 19, 2014.

The Court also grants WKFS's motion for leave to pursue additional discovery prompted

by the Amended Complaint, and directs that such discovery proceed under the fee-shifting terms

set out above.  All additional fact discovery is to be completed by Tuesday, January 27, 2015.

The Court directs that, by Tuesday, February 3, 2015, any party intending to move for

summary judgment submit a three-page, single-spaced letter previewing this motion; and that by

Tuesday, February 10, 2015, any letter (subject to the same limit on length) responding to such a

motion be submitted.  A conference in this case will be held on Friday, February 20, 2015, at 4

p.m., to discuss and set a prompt schedule for the filing of any additional summary judgment motions, and/or for trial.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: December 15, 2014
        New York, New York

32